385 P.2d 156

**FREED FINANCE COMPANY, a corporation, Plaintiff and Respondent,**

v.

**W. J. PREECE, William V. Preece and Preece Motor, Inc., a corporation, Defendants,
William V. Preece, Defendant and Appellant.**

**No. 9858.**

Supreme Court of Utah.

Sept. 20, 1963.

Moyle & Moyle, Verl C. Ritchie, Salt Lake City, for defendant and appellant.

Mark K. Boyle, Salt Lake City, for defendants.

Callister & Kesler, Salt Lake City, for plaintiff and respondent.

## HENRIOD, Chief Justice.

Appeal from a judgment for plaintiff in a case involving liability under an alleged written guarantee. Reversed with instructions to dismiss the complaint as to defendant Wm. V. Preece. Costs to appellant.

Wm. V. and W. J. Preece, father and son, for many years were partners dealing in automobiles. In 1954, shortly before the father was to leave on a mission for the dominant church, he signed a general power of attorney authorizing his son to act in his stead. It is uncontroverted that this power of attorney, with one exception, was used only to receive and send checks to the father, or to place them in his account for the purpose of defraying the latter's expenses while on the mission, which lasted approximately two years. Only on one other occasion, about 5½ years after the father's return, did the son assert any authority under the power of attorney, which for the first time occurred in the trial of this case.

For years the plaintiff, Freed, had financed the partnership, and a corporation later formed in 1959, owned by the two Preeces, with respect to car loans. The son apparently operated the business, which suffered financial difficulties in 1960. In February of that year, Freed, in an effort to help salvage the business, advised the son that further funds would be available only on the sole condition that he and his father personally sign a guarantee of the corporation's obligations, and that time was of the essence.

It is undisputed that on the same day the son deposited a guarantee agreement with Freed that ostensibly was signed by both father and son; the father had not signed, but on which the son signed his father's name, without the knowledge or authority of the father, and without apprising Freed that his father had not signed; that Freed accepted the document, assuming the father actually had signed, relying on such assumption, without any knowledge of or any reliance upon any power of attorney or authority on the part of the son to act on behalf of his father.

Then came the earth tremors,—this lawsuit to recover unpaid advances by Freed. After considerable procedural sparring and lawyer talk, the important matter of evidence was indulged.

There was a lot of testimony with respect to whether the power of attorney had died on the demise of the father's mission assignment. Neither father nor son could remember the conversations immediately prior to the former's departure, but repeatedly both said the power of attorney was executed to take care of the father's affairs only during the time he was absent.

It seems almost inescapable to conclude other than that non-use of the power at any time during six years after the father returned supports such contention, and bolsters appellant's assertion that the power of attorney died with the father's return, or at least within a reasonable time thereafter. It appears obvious from the record that the son signed his father's name in a desperate effort to obtain needed funds to keep the business afloat, and equally as obvious that he remembered, as an after-thought,—after institution of this litigation, that there was a more or less ancient document to which he could refer to establish authority to sign his father's name to an instrument, without the latter's knowledge or consent, in handwriting obviously not that of his father, nor his own. Space does not permit a duplication of the signed document, but this court's word can be taken for the fact that the son's signing of his father's name did not have the characteristics of his own handwriting, and appeared to be designed, not to show any power of attorney, but to represent someone's else handwriting than his own. Freed relied on this representation, and did not rely on a power of attorney situation. We think that on the record, Freed, not knowing of a seven-year old father-son-mission arrangement, cannot advantage itself with opinion testimony of a professed agent, which could not, under general principles, prove an agency.

The only evidence drawn out by Freed's counsel was to the effect that the father and son, both of whom he called as witnesses, were hazy and uncertain as to conversations had about 7 years before and that there was no definite understanding as to a definite termination date of the power of attorney,—except,—that both repeatedly indicated that the authority was intended to continue only during the time father was on a mission. We think this conclusion to have been substantiated not only by non-user of the power of attorney for at least 5½ years after the father returned, but by the belated, and self-serving statement of a son faced with an embarrassing situation, that "Well, at the time * * * I made out the financial statement and signed it, and my father not being available to sign it, I signed it and at the time I know it run through my mind, well, I have got a power of attorney, I mean if it is questioned." This, without telling Freed the facts and in an obvious attempt, by using two different types of handwriting, to obfuscate the circumstances, the truth of which, known to Freed, no doubt would have led to no loan, or, if granted, clearly would have required an unqualified, unobscure, binding promise upon which Freed safely could have held the father without all the rather fanciful, belated peripatetics indulged in this case in what we think was a time-rusted, self-serving effort to circumvent a known, but undisclosed indiscretion.

All of the above by way of analysis of the facts, recognizing full well the scope of review is to view them favorably to the decision of the trial court. But the trial court's findings obviously were not based on the facts most favorable to anyone. It was based on erroneous findings and conclusions: that because the son and the corporation stipulated to a judgment against them, (the father denying liability), the father, in stipulating that such a judgment could be taken against the other two, therefore became bound to that judgment. This is a *non sequitur*. As to a previous "Memorandum Decision" which was not incorporated in the judgment, and would not have to be considered here, we nonetheless observe that the trial court in asserting that the father "should have terminated the power (of attorney) when he returned from England," indulged another non sequitur, since a power of attorney may terminate when its purpose has been exhausted, and there was no formal finding to the contrary in this case. Assuming that the Memorandum Decision could be construed as a finding of fact, it is based on the assumption that the father should have terminated the agency by tearing up the paper reflecting it, because the son happened to say he *thought* he had a power of attorney. We take it that a finding of agency based upon the thinking of the agent, cannot be supported under the authorities, and in no event could bind a principal at the urgence of third parties stranger to the fiduciary relationship in question, who knew nothing about, nor relied on any such relationship.

McDONOUGH, CROCKETT and WADE, JJ., and A. H. ELLETT, District Judge, concur.

CALLISTER, J., having disqualified himself, did not participate.